UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


NICK VANWAGONER,

                  Petitioner,                        Hon. Janet T. Neff

v.                                              Case No. 1:13-CV-874

PAUL KLEE,

                  Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on VanWagoner's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that VanWagoner's petition be **denied**.


## BACKGROUND

As a result of events allegedly occurring on December 25, 2007, Petitioner was charged with second degree criminal sexual conduct. (Trial Transcript, March 8, 2010, 9). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Lloyd Swadling**

As of September 17, 2009, Swadling was employed as a children's protective services worker.  (Trial Transcript, March 8, 2010, 95-96).  On this date, Swadling received a complaint from Tina Boughner regarding a child named J.P.  (Tr. 96-97).  Swadling did not conduct an investigation into the matter, but instead reported the matter to law enforcement.  (Tr. 97-98).

**Joy Petrowski**

Petrowski and Petitioner had been in a relationship for more than fifteen years and have two children together, J.W. and R.W., aged 10 and 4 respectively.  (Trial Transcript, March 8, 2010, 102-04).  Petrowski is sister to J.P.  (Tr. 104-05).  On 3-4 occasions between 2006 and 2008, J.P. stayed overnight at the home Petrowski and Petitioner shared.  (Tr. 106-07).  When J.P. stayed overnight she slept on the floor in the same bedroom as Petrowski's two children.  (Tr. 107-08).  While there was enough room on the floor for J.P. to sleep, there was not enough room on the floor for an adult to lay down.  (Tr. 109-12).  J.P. stayed two nights with Petrowski and her family in December 2007, "shortly after Christmas."  (Tr. 126-27).  During this visit, J.P. "acted normal, like any other kid."  (Tr. 129).  During the time of J.P.'s visit, Petitioner was wearing a "knee brace" which rendered him "pretty much stationary."  (Tr. 131).

In the summer of 2008, Petrowski's father and girlfriend, Charlene Cochran, went to Petrowski's residence.  (Tr. 116).  Cochran told Petrowski that Petitioner had "touched" J.P.  (Tr. 116).  J.P. was present when these allegations were made.  (Tr. 116-20).  Cochran had previously asked Petrowski for money to pay off debt's that Petrowski's father owed.  (Tr. 118-19).  When asked by Petrowski, Petitioner denied that he "touched" J.P.  (Tr. 136-37).

**Tina Boughner**

As of May 2009, Boughner was employed as a foster care specialist with Child and Family Services.  (Trial Transcript, March 8, 2010, 139-40).  In May 2009, J.P. "came into foster care" because her parents "were unable to care for her and provide for her."  (Tr. 141).  J.P. was eventually placed in the care of Lisa Powell who cared for J.P. from June 2009 through February 2010.  (Tr. 142).  J.P. was in the ninth grade, but was receiving special education services at school because "her reading skills are at a third or fourth grade level."  (Tr. 143).

On September 9, 2009, Joy Petrowski offered to care for J.P.  (Tr. 144-45).  Boughner did not pursue the matter though because she was aware that placement with Petrowski was unacceptable to both J.P. and her parents.  (Tr. 145, 157).  On September 16, 2009, Boughner learned of the allegation that Petitioner had "touched" J.P.  (Tr. 145).  Boughner did not question J.P. about the matter.  (Tr. 146).  Boughner also instructed Lisa Powell "to be alert for any further disclosures, but do not question [J.P.] at all about the time frame or the incident itself."  (Tr. 146).  After disclosing her allegations against Petitioner, J.P. became "more depressed, more withdrawn, [and] more anxious."  (Tr. 147).

**Fred Petrowski**

Petrowski is J.P.'s father.  (Trial Transcript, March 8, 2010, 163).  J.P. lived with her father and his girlfriend until February 2009, at which point J.P. began living with her mother.  (Tr. 164-65).  In 2006-2007, J.P. stayed overnight with Joy Petrowski on approximately four occasions, the last visit occurring on December 25, 2007.  (Tr. 165-66).  Petrowski picked up J.P. following this last visit.  (Tr. 166).  Petrowski saw no evidence that Petitioner was injured.  (Tr. 184-85).  As

Petrowski was driving the pair home, J.P. began crying and "told [Petrowski] what happened." (Tr. 166-67). Specifically, J.P. indicated that Petitioner "tried to mess with her" and was "trying to get her belt off her pants and get her pants down." (Tr. 169). When asked whether J.P. also alleged that Petitioner touched her vagina, Petrowski stated that he could not recall. (Tr. 169-70). After revealing this information, J.P. became "pretty quiet for a while." (Tr. 172).

Petrowski did not inform the police or J.P.'s mother. (Tr. 167). J.P. "begged" Petrowski to not inform "anybody" about her allegations. (Tr. 170). Petrowski shared J.P.'s allegations with his girlfriend, Charlene Cochran, but the pair "just pretty much kept it to [them]selves." (Tr. 167-68). Several months later, Petrowski decided to inform Joy Petrowski about J.P.'s allegations. (Tr. 170-71). Petrowski decided on this course of action because "they have a little daughter, too, and I was concerned about her safety." (Tr. 170-71). When confronted, Petitioner denied J.P.'s allegations. (Tr. 173-77). Petrowski denied asking Joy Petrowski or Petitioner for money. (Tr. 173-74).

**Charlene Cochran**

Cochran began a relationship with Fred Petrowski in June 2007. (Trial Transcript, March 8, 2010, 200). J.P. stayed with Petitioner at Christmas that year. (Tr. 203). Following this visit, J.P. alleged that Petitioner "had put his hands in her pants and whatever." (Tr. 203). The following summer, Cochran, Fred Petrowski, and J.P. drove to Petitioner's residence to inform Joy Petrowski of J.P.'s allegations. (Tr. 206-13). Upon their arrival, Fred Petrowski began speaking with Joy Petrowski. (Tr. 213-14). Shortly thereafter Petitioner exited his residence and learned that he was being accused of molesting J.P. (Tr. 214-15). At this point, Petitoner walked over to

4

Cochran's side of the car, spit in her face, and called her a "bitch."  (Tr. 214-15).  Cochran denied

that she or Fred Petrowski asked Petitioner or Joy Petrowski for money.  (Tr. 224-25).

**Lisa Powell**

Powell began caring for J.P. in June 2009.  (Trial Transcript, March 8, 2010, 233-34).

J.P. did not "act like a normal teenager," but instead acted "like a little girl."  (Tr. 240).  At school,

J.P. functioned at a "third to fourth grade level."  (Tr. 240).  In September 2009, J.P. began to tell

Powell about an incident that occurred when she was visiting at Joy Petrowski's home.  (Tr. 237-39).

Powell stopped J.P., however, and told her that she needed to discuss it with her counselor.  (Tr.

239).  Thereafter, J.P. began "dress[ing] in layers of clothes" and "fe[lt] very disgusted with herself."

(Tr. 241).

**J.P.**

J.P. was born on May 4, 1995, and was then 14 years of age.  (Trial Transcript, March

9, 2010, 5).  She and Joy Petrowski are half-sisters, both being fathered by Fred Petrowski.  (Tr. 7).

J.P. would occasionally spend the night with Joy Petrowski and her family.  (Tr. 7-8).  On these

occasions, J.P. slept on the floor in the children's bedroom.  (Tr. 8-10).  The last time J.P. stayed the

night at Petrowski's home was Christmas night 2007.  (Tr. 10).

J.P. did not bring any other clothes with her so she slept in her pants and shirt.  (Tr.

10).  J.P. awoke in the night when Petitioner began "tugging on" her belt.  (Tr. 12-20).  Petitioner

eventually undid J.P.'s belt at which point he unzipped her pants and placed his hand "underneath

[J.P.'s] underwear and started rubbing" her vagina.  (Tr. 12-21).  The next day, J.P. did not mention

this incident to her sister because she was "scared of" Petitioner. (Tr. 23). After returning home, J.P. told her father what Petitioner had done. (Tr. 24-27). Fred Petrowski responded by stating, "let's call the cops." (Tr. 27). J.P. told her father that she "didn't want to do anything" because "the last time" something like this happened to her "nothing happened." (Tr. 27).

Several months later, J.P. accompanied her father and his girlfriend when they traveled to Joy Petrowski's residence to inform her what Petitioner had done to J.P. (Tr. 31-32). When Fred Petrowski informed his daughter what Petitioner had done, Joy Petrowski responded that "she does not care and it happened to her before." (Tr. 33). When confronted by Fred Petrowski, Petitioner denied J.P.'s allegations. (Tr. 33). During this encounter, neither Fred Petrowski nor Charlene Cochran asked Petitioner or Joy Petrowski for money. (Tr. 40).

**Brett Gooding**

As of September 22, 2009, Gooding was employed as a Trooper with the Michigan State Police. (Trial Transcript, March 9, 2010, 63-64). On this date, Gooding interviewed J.P. (Tr. 64). Gooding indicated that it was "very common" for a "young victim" to delay reporting allegations of sexual abuse. (Tr. 65-66). Gooding also indicated that it was "pretty common" for a family to "not want to proceed in a case like this." (Tr. 66). When Gooding interviewed J.P., "the farther she got into explaining what had happened. . .she was becoming more and more upset." (Tr. 68). J.P. "kind of withdrew into herself" and appeared to be "embarrassed." (Tr. 68-69). J.P.'s statements to Gooding "remain[ed] consistent" throughout his investigation. (Tr. 76). Gooding "did not get th[e] opinion" that J.P. was "regurgitating something that had been told to her earlier." (Tr. 77). When Gooding interviewed Petitioner, he was "defensive, barely cooperative." (Tr. 69).

6

**Corinna Berden**

From 2005-2008, Berden was employed as a Early Head Start child family specialist. (Trial Transcript, March 9, 2010, 80).  In this capacity, Berden conducted "home visits" to Petitioner's residence to provide "parenting resources" and "education for birth to three-year-olds." (Tr. 81).  Berden indicated that the doors between the two bedrooms in Petitioner's residence were "close together." (Tr. 82).  Berden recalled that "around New Year's" Petitioner suffered an injury which required him to wear a knee brace.  (Tr. 89-90).  Berden could not, however, recall what year Petitioner suffered this injury.  (Tr. 90).

**Nicole Fenstermaker**

From February 2009, through October 2009, Fenstermaker, in her capacity as a family empowerment worker, met with Petitioner and Joy Petrowski to assist them with difficulties they were experiencing with their son Johnny.  (Trial Transcript, March 9, 2010, 93-95).

**Nick VanWagoner**

Petitioner denied that J.P. stayed at his house on Christmas night 2007, instead asserting that she stayed with them on the night of January 1, 2008.  (Trial Transcript, March 9, 2010, 101-04, 109, 116, 124).  Petitioner injured his knee the previous night and was wearing a knee brace when J.P. visited.  (Tr. 110, 114-16).  Petitioner denied touching J.P. or even entering the room where she was sleeping.  (Tr. 97-98).  On January 15, 2008, Fred Petrowski drove Petitioner to his Social Security disability hearing.  (Tr. 109-11, 124-25).  During this encounter, Fred Petrowski never made any mention that J.P. had been sexually assaulted during her recent visit to Petitioner's

7

residence.  (Tr. 111).

In August 2008, Fred Petrowski and Charlene Cochran drove to Petitioner's residence.  (Tr. 98).  Fred Petrowski initially spoke with Joy Petrowski, but Petitioner was later "called out there."  (Tr. 99).  Fred Petrowski then accused Petitioner of sexually assaulting J.P.  (Tr. 99).  Cochran then began calling Petitioner a child molester and pervert.  (Tr. 99).  Petitioner "begged" Fred Petrowski to call the police because he was confident he would "be out of jail in five minutes."  (Tr. 100).  Shortly after this incident, Charlene Cochran asked Petitioner for some of his "Social Security money."  (Tr. 100-01).  Petitioner interpreted this as a request that Petitioner pay them money in return for not reporting the matter to the police.  (Tr. (Tr. 123-24).  Petitioner refused Cochran's request.  (Tr. 126).

Following the presentation of evidence, the jury found Petitioner guilty of second degree criminal sexual conduct.  (Trial Transcript, March 10, 2010, 6).  Petitioner was sentenced as an habitual offender to serve 2-22 years in prison.[1]  (Sentence Transcript, April 27, 2010, 8).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.   Did the trial court abuse its discretion by overruling Defendant's relevancy objection to testimony by the complainant's father's girlfriend that the complainant's behavior toward men changed after the claimed sexual contact.
>
> II.  Was Defendant deprived of a fair and impartial trial by the prosecutor's misconduct in asking the

---

[1]  Petitioner was released from MDOC custody on January 9, 2015.  *See* Nick E. VanWagoner, available at http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=762622 (last visited on March 3, 2016).  Generally, a petition for habeas corpus is rendered moot when the petitioner is released from custody unless he can demonstrate some "concrete and continuing injury."  *See Ruggles v. Michigan Department of Corrections*, 2011 WL 1812206 at *7 (E.D. Mich., May 12, 2011) (quoting *Spencer v. Kemn*, 523 U.S. 1, 7 (1998)).  "Ordinarily, a habeas petition challenging a criminal conviction will not be moot, because the criminal conviction almost always carries continuing collateral consequences."  *Ruggles*, 2011 WL 1812206 at *7.  Given that Petitioner is challenging the constitutionality of his conviction, the Court finds that VanWagoner's petition for writ of habeas corpus is not moot.

investigating officer assisting him how he became
assured that the complainant was telling the truth.

III.   Defendant was denied the effective assistance of trial
counsel by violating the Defendant's Sixth
Amendment right to present a defense, where
counsel: (1) failure to use the Defendant's witness,
(2) failed to impeach complainant for prior false
accusations of molestation that she later recanted, and
(3) failed to disqualify himself as counsel due to
conflict of interests.

IV.   Defendant was denied his right to a fair and impartial
jury.[2]

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v.
VanWagoner*, 2011 WL 2732151 (Mich. Ct. App., July 14, 2011).  Asserting the same four issues,
Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal.  *People v.
VanWagoner*, Case No. 143531, Order (Mich., Nov. 21, 2011).  Petitioner initiated the present
action on January 17, 2013, asserting the four issues identified above.

## STANDARD OF REVIEW

VanWagoner's petition is subject to the provisions of the Antiterrorism and Effective
Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the
substantive standards for granting habeas relief under the following provisions:

(d)   An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
the adjudication of the claim —

---

[2] Issues I and II were asserted by Petitioner's counsel whereas issues III and IV were asserted by Petitioner in a
supplemental pleading.

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply

10

because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta."

*Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

      As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).  This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).  Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."  *Id.* at 784-85.  Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

      The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."  *Id.*  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

<u>**ANALYSIS**</u>

**I.**         **Evidentiary Claim**  (Habeas Claim I)

During questioning of Charlene Cochran by the prosecuting attorney, Duane Beach, the following exchange occurred between Cochran, Beach, Petitioner's attorney, Daniel Hartman, and the trial judge:

> Mr. Beach:    Did [J.P.'s] behavior change after Christmas of 2007 other than not seeing her sister and Mr. VanWagoner?  Did you notice any change in the way she behaved?
>
> Mr. Hartman:  Your Honor, I'm going to object as to relevance.
>
> The Court:    Overruled.
>
> Mr. Hartman:  Your Honor, how is changes in behavior probative of -
>
> The Court:    Mr. Hartman, I don't need to explain my rulings to you.  I've made them, and you may go on, Mr. Beach.
>
> Mr. Beach:    Thank you.
>
> Cochran:      Yes, I felt that she was very leery of men.

(Trial Transcript, March 8, 2010, 206).

Petitioner argues that introduction of this testimony deprived him of the right to a fair trial.  As Respondent notes, however, this claim has not been properly exhausted.  While Petitioner asserted in the state courts a claim concerning the introduction of the testimony in question, Petitioner did not assert that such denied him of the right to a fair trial.  Instead, Petitioner merely argued that the evidence was irrelevant and admitted in violation of Michigan Rule of Evidence 402.  Petitioner's failure to exhaust this claim notwithstanding, the Court can deny such on the merits.  *See* 28 U.S.C. § 2254(b)(2) (a habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

13

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted). Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007).

The Sixth Circuit has found that the improper introduction of evidence violated a criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence

linking the defendant to the crime.  *See Ege*, 485 F.3d at 374-78.  However, where there exists sufficient other  evidence of guilt and the challenged evidence is only "peripheral to the case against" the defendant, the Sixth Circuit has found no due process violation.  *Collier v. Lafler*, 2011 WL 1211465 at *3 (6th Cir., Mar. 30, 2011).  The challenged testimony was, at most, only peripheral to the case against Petitioner as other evidence was more than sufficient to establish Petitioner's guilt.

The Michigan Court of Appeals rejected Petitioner's claim that the evidence in question was improperly admitted.  In addition to finding that introduction of Cochran's statement was proper, the court also noted that other witnesses, Fred Petrowski, Tina Boughner, and Lisa Powell, all provided similar testimony to which Petitioner did not object.  *VanWagoner*, 2011 WL 2732151 at *8-9.  In light of the above authority and facts, the Court concludes that the determination by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this determination was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.**          **Prosecutorial Misconduct**  (Habeas Claim II)

During his questioning of Trooper Brett Gooding, the prosecuting attorney asked "what are some of the things that during the interview led you to become assured that [J.P.] was telling the truth."  (Trial Transcript, March 9, 2010, 66-67).  Before Gooding could respond, Petitioner's attorney raised an objection which was immediately sustained by the trail judge.  (Tr. 67).  Petitioner argues that by asking the aforementioned question, the prosecutor committed

misconduct entitling him to relief in this matter.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Petitioner must do more than show that the prosecutor's conduct was "undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Instead, Petitioner must demonstrate that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219). Furthermore, where evidence of guilt is "overwhelming," it is less likely that the jury was influenced by allegedly improper conduct by the prosecutor. *See Darden*, 477 U.S. at 182 ("[t]he weight of the evidence against petitioner was heavy; the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges,' reduced the likelihood that the jury's decision was influenced by [improper] argument").

The Supreme Court has recently emphasized that "the *Darden* standard is a very general one, leaving courts 'more leeway. . .in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012). Furthermore, the standard regarding a prosecutorial misconduct claim "is a high one." *Bales v. Bell*, 788 F.3d 568, 579 (6th Cir. 2015). The Court's role "is not to supervise the state court but to ensure that the state court has not contradicted federal law so as to deny a petitioner due process." *Id.* (citing *Darden*, 477 U.S. at 181). As if to underscore these points, the Supreme Court has recently admonished the Sixth Circuit

for resolving prosecutorial misconduct claims, raised in petitions for writ of habeas corpus, by reliance on circuit court authority and self-created multi-factor tests. *Parker*, 132 S.Ct. at 2155.

The Michigan Court of Appeals rejected Petitioner's prosecutorial misconduct claim, finding as follows:

> While defendant assigns error to the prosecutor's conduct, when reviewing the record, we find no error. The prosecutor asked a single question about [J.P.'s] truthfulness to Trooper Gooding, however, defense counsel immediately objected to the question, the trial court sustained the objection, and the witness did not answer the question. With regard to any import defendant assigns to the mere asking of the unanswered question regarding the victim's truthfulness, the trial court instructed the jurors that they were the sole judges of witness credibility. The trial court also instructed the jurors that the lawyers' questions, statements, and arguments are not evidence. The trial court continued as follows:
>
>> You should consider the questions only as they give meaning to the witnesses' answers, and you should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge.
>
> Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors. The instructions were sufficient to dispel any possible prejudice. Under these circumstances, the prosecutor's asking of this single question did not deny defendant a fair and impartial trial. On this basis, defendant cannot establish plain error that resulted in the conviction of an innocent defendant or plain error that seriously affected the fairness, integrity or public reputation of the proceedings.

*VanWagoner*, 2011 WL 2732151 at *9-10 (citations omitted).

The trial judge instructed the jury, in part, that: (1) it was their responsibility to decide the facts; (2) their verdict must be based on the evidence; (3) they may only consider evidence which was properly admitted; (4) only sworn testimony and admitted exhibits are evidence; (5) the lawyers' questions are not evidence; (5) the jury was responsible for assessing each witness'

credibility.  (Trial Transcript, March 9, 2010, 163-71).  As the Michigan Court of Appeals recognized, jurors are presumed to follow their instructions, *see Bales*, 788 F.3d at 579, and Petitioner has articulated no rationale for concluding otherwise in this case.

The Michigan Court of Appeals rejected this particular claim.  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

III.        **Ineffective Assistance of Counsel**  (Habeas Claim III)

Petitioner argues that he is entitled to relief because his trial counsel provided constitutionally deficient representation.  Specifically, Petitioner faults his attorney for: (1) failing to call his then girlfriend to testify at trial; (2) failing to impeach J.P. concerning prior false molestation allegations; and (3) failing to disqualify himself due to a conflict of interest.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel

18

made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."  *Premo*, 562 U.S. at 122.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.* (citations omitted).  As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).


      A.      Failure to Question Joy Petrowski

Petitioner argues that his trial counsel improperly failed to call his then girlfriend, Joy Petrowski, to testify at trial.  Petitioner asserts that had counsel called Petrowski to testify she would have offered favorable testimony regarding "the dates of the alleged events."  While Petitioner is correct that his attorney did not call Petrowski to testify at trial, Petitioner overlooks the fact that Petrowski was called to testify by the prosecution in the State's case-in-chief.

Following the prosecutor's questioning of Petrowski, Petitioner's counsel cross-examined Petrowski and elicited testimony favorable to Petitioner.  Specifically, counsel elicited from Petrowski that J.P. did not stay with her and Petitioner on Christmas night 2007, but instead stayed with them after Christmas.  (Trial Transcript, March 8, 2010, 126-27).  Petrowski also testified that during the time of J.P.'s visit, Petitioner was wearing a "knee brace" which rendered him "pretty much stationary."  (Tr. 131).

As the Michigan Court of Appeals observed, counsel elicited from Petrowski testimony favorable to Petitioner's cause and which corroborated Petitioner's version of events. *VanWagoner*, 2011 WL 2732151 at *11-12.  Accordingly, the court rejected this particular claim. This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Failure to Impeach J.P.

Petitioner next faults his attorney for failing to impeach J.P. regarding "prior allegations of molestation" which were "false and later recanted."  As noted above, J.P. urged her father not to report her allegations against Petitioner to the police because "the last time" something like this happened to her "nothing happened."  (Trial Transcript, March 9, 2010, 27).  While not expressly stated, the clear implication of J.P.'s testimony was that she had previously been sexually assaulted and that in response "nothing happened."

As the Michigan Court of Appeals noted, however, Petitioner has failed to present or identify any evidence indicating that J.P.'s prior allegations of sexual assault were "false" or that she "recanted" such.  *VanWagoner*, 2011 WL 2732151 at *12-13.  The court, therefore, rejected this particular claim.  This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


C.      Disqualification

Petitioner next argues that he is entitled to relief because his trial counsel labored under an improper conflict of interest.  Specifically, Petitioner asserts that his attorney represented him at trial while "married to the daughter of the alleged victim's father's brother."

It is well established that a criminal defendant's Sixth Amendment right to counsel is denied "when an attorney's actual conflict of interest adversely affects his performance."  *Peters v. Chandler*, 292 Fed. Appx. 453, 456 (6th Cir., Sept. 9, 2008) (citing *Mickens v. Taylor*, 535 U.S.

162, 166 (2002) and *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)).  Because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," prejudice "is presumed when counsel is burdened by an actual conflict of interest." *Boykin v. Webb*, 541 F.3d 638, 643 (6th Cir. 2008) (quoting *Strickland*, 466 U.S. at 692).  However, merely claiming that his attorney labored under a conflict of interest is insufficient to merit relief.  *See Whiting v. Burt*, 395 F.3d 602, 611 (6th Cir. 2005).  Petitioner must instead demonstrate that his attorney "actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance."  *Id.*

As the Michigan Court of Appeals noted, Petitioner presented no evidence to support his allegation that his attorney represented him while married to a relative of J.P.  *VanWagoner*, 2011 WL 2732151 at *13.  The court further noted that Petitioner "never asserts in his Standard 4 brief that any alleged conflict actually adversely affected his lawyer's performance or caused him to take an action that was not in the defendant's best interest."  *Id.*  As Petitioner failed to establish that his attorney labored under a conflict of interest or that any such conflict adversely affected his performance, the court rejected this claim.  This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.**          **Right to a Fair and Impartial Jury**  (Habeas Claim IV)

Finally, Petitioner asserts that one of the jurors was married to a relative of J.P. a fact which "was not divulged during the trial." Petitioner argues that this circumstance served to deny him the right to be tried by a fair and impartial jury.

The Sixth Amendment commands that every criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. In addition to the safeguards articulated in the Sixth Amendment, the Constitution's due process protections likewise afford to criminal defendants the right to be tried by an impartial jury. *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). As is recognized, the voir dire process is designed to protect this right "by exposing possible biases, both known and unknown, on the part of potential jurors." *Mitchell*, 354 F.3d at 520 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

When the ability of a juror to serve impartially is at issue, "the relevant question is 'did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *Mitchell*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). In the context of a petition for writ of habeas corpus, a trial court's assessment regarding a juror's ability to serve impartially is a factual finding "entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence." *Mitchell*, 354 F.3d at 520.

Contrary to Petitioner's assertion, the facts and circumstances underlying this claim were made known to the court. During the early stages of the jury selection process, the trial judge asked prospective jurors whether they knew any of the witnesses who may testify at trial. (Trial

23

Transcript, March 8, 2010, 19).  The following exchange then occurred between the trial judge and

Juror #13:

| | |
|---|---|
| Juror #13: | Almost every one of the Petrowskis.  Fred is my brother-in-law.  Gwen was his ex-wife.  And a couple of the other ones; I can't remember all your - the names you said, but. . . |
| The Court: | All right.  Are you particularly close with any one or more of these folks? |
| Juror #13: | Just other than I see them occasionally. |
| The Court: | Just know who they are? |
| Juror #13: | Family outings and things. |
| The Court: | It's not at all unusual, in the small community that we have, that jurors will know one or more of the people who will testify as witnesses in a case.  And the fact that you know somebody doesn't disqualify you from serving.  The issue is whether you know them in such a way that you would not be able to judge them with an open mind. |
| | In other words, sometimes, after you know someone over a period of time, you come to a firm conclusion about their character, their credibility, in other words, are they honest, do they remember things accurately, things like that.  And sometimes you may know someone for quite a while, but never have an experience that causes you to say, yup, that person is honest as the day is long or you can't believe a word that person says or some variation of that that says that you've got an opinion about their character and their credibility. |
| | And sometimes you can reach an opinion like that about someone's character or credibility the first time you meet them, too, you know.  So, really, that's the issue here.  Have you had any sort of interaction with any one of more of these Petrowskis. . .such that when they came to the witness stand, you'd have a preconceived notion about whether you'd believe them or not? |
| Juror 13: | No. |
| The Court: | You've not had any experience of that nature? |

24

| Juror 13: | No. |
|---|---|
| The Court: | And you would then be able to judge any one or - one of the Petrowskis, if they testify, the same way you would judge any other witness who testifies? |
| Juror 13: | Correct. |
| The Court: | And you wouldn't start off either tending to believe or disbelieve them based on prior experience? |
| Juror 13: | No. |
| The Court: | Okay.... |

(Tr. 21-23).

The trial judge did not excuse Juror #13 for cause and despite having ample opportunity to question Juror #13, neither party questioned Juror #13 any further about his knowledge of the Petrowski family. (Tr. 23-67). Neither party moved to have Juror #13 excused for cause. (Tr. 23-67). Likewise, Petitioner declined to utilize a peremptory challenge to excuse Juror #13. (Tr. 23-67). The Michigan Court of Appeals rejected this claim finding as follows:

> There is no indication in the trial court's lengthy inquiry of Juror 13 that he would not be impartial. There was nothing to indicate that Juror 13 was somehow biased, had preconceptions about any of the Petrowski family witnesses including defendant, or simply could not be impartial because of his relationship by marriage to Fred. Indeed, it may have been a strategic move not to object to Juror 13 because defendant could have thought his presence on the jury was a positive for him being that he is also a member of the Petrowski family since he has been involved with Joy, Fred's daughter, for 15 years and is the father of her two children. Because Juror 13 confirmed that he would be impartial and judge the Petrowskis like any other witnesses, there was no basis to challenge him for cause. Defendant has not shown he was denied his right to a fair and impartial jury at trial.

*VanWagoner*, 2011 WL 2732151 at *15.

Juror #13 stated that he could fairly decide the case on the evidence and there is

25

nothing in the record to suggest that his statements in this regard are unworthy of belief.  As noted above, the state court's determination that Juror #13 was capable of serving impartially is a factual finding "entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence."  *Mitchell*, 354 F.3d at 520.  Petitioner has presented no such evidence.  In sum, the state court decision rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner's conviction was not obtained in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that VanWagoner's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  May 12, 2016                                  /s/ Ellen S. Carmody
                                                    ELLEN S. CARMODY
                                                    United States Magistrate Judge